**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

In re:

CHAIT PROPERTIES, INC.,

Case No. 8-11-78236-reg

Chapter 11

Debtor.

**DECISION**

Before the Court is the Motion of People's United Bank, FSB ("People's Bank") Pursuant to Section 506(a)(1) of the Bankruptcy Code and Bankruptcy Rule 3012 for an Evidentiary Hearing to Determine the Value of People's First Priority Lien for Sections 1129(b) and 1111(b) Election Purposes in this Case (the "Valuation Motion"), Docket No. 79. Seeking to determine the value of its claim based on a note and mortgage secured by the real property owned by Chait Properties, Inc. (the "Debtor") located at 60 Front Street, East Rockaway, New York ("60 Front Street" or the "Subject Property"), People's Bank argues that 60 Front Street is presently worth either $6.3 million under an income capitalization approach or $6.2 million using a sales comparison approach and will be worth either $6.8 million or $6.7 million, respectively, once stabilized. In contrast, the Debtor contends that 60 Front Street is worth only $4.75 million in its present condition and will be worth no more than $5,149,600 within nine-to-twelve months. According to the Debtor and People's Bank (collectively, the "Parties"), the differences in these values is attributable to only two factors: (1) the vacancy rate, which People's Bank projects will be 3% (1 out of 43 apartments) but which the Debtor assumes will be 12% (5 out of 43) once 60 Front Street is stabilized, and (2) the capitalization rate (the "cap

rate"), which People's Bank calculates to be approximately 5.75% but which the Debtor estimates is 6.5%. Based on the entire record and for the reasons more fully set forth below, the Court adopts People's Bank's valuation of 60 Front Street in the amount of $6.3 million, assuming a vacancy rate of 3% and a cap rate of 6%.

**PROCEDURAL POSTURE**

On November 21, 2011, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Code"). On January 25, 2012, People's Bank filed Proof of Claim Number 3-1. On April 9, 2012, the Debtor filed a Disclosure Statement and Plan of Reorganization. In the Disclosure Statement, the Debtor notes that People's Bank filed a secured claim in the amount of $6,449,212.95, plus charges, but disputes People's Bank's valuation of the collateral and thus the value of the secured portion of People's Bank's claim as filed. The disclosure statement values 60 Front Street at only $5.1 million, thus proposing to reduce the secured potion of People's Bank's claim. People's Bank filed an amended proof, number 3-2, on April 23, 2012. With this amended proof, People's Bank included an appraisal from All Island Valuation Services that valued the Subject Property at $4.525 using the sales comparison approach and $4.35 million employing the income capitalization approach. Subsequently, on April 1, 2013, People's Bank filed the Valuation Motion before the Court.

Thereafter, the Debtor and People's Bank hired competing experts to value 60 Front Street and exchanged the resulting appraisals. On July 12, 2013, the Debtor filed a modified liquidation analysis that set the Fair Market Value ("FMV") of 60 Front Street at $5.5 million. On July 15, 2013, People's Bank filed a second amended proof, number 3-3, asserting that the value of 60 Front Street is presently $6.3 and is projected to be $6.8 million under an income

capitalization approach. On August 26, 2013, the Court held an evidentiary hearing on valuation in which the Parties' experts testified. At the conclusion of this hearing, the question of 60 Front Street's value was submitted to the Court.

**FACTS**

The Debtor is a corporation organized under the laws of the State of New York; its principal is Mr. Daniel Chait ("Mr. Chait"). The Debtor purchased 60 Front Street for $4.85 million on September 24, 2008. A 43-unit multi-family complex, 60 Front Street consists of four separate two-to-three story residences designed for persons fifty-five and older and situated on a 1.380-acre waterfront site. To finance this purchase, the Debtor borrowed $6 million from Bank of Smithtown, to which People's Bank is a successor by acquisition, secured by a contemporaneously executed mortgage on 60 Front Street. Proof of Claim 1-1, Addendum to Proof of Claim ¶ 3 n.1. As stated above, People's Bank asserts a secured claim of $6.8 million, but the Debtor insists that People's Bank's claim is only secured up to $4.75 million and has proposed a plan that treats People's Bank as having a $5.5 million secured claim. Each party's designated expert testified before the Court on August 26, 2013. Trial Tr. 99:14–15, Aug. 26, 2013, Docket No. 101.

The Debtor hired Mr. Mitchell Greenspan ("Mr. Greenspan") to prepare its valuation. Trial Tr. 19:11–13, 23–25. Mr. Greenspan is the President of Realco Group Asset Management, Ltd., a property management leasing and brokerage corporation with its principal location in Garden City, New York; he has been a licensed real estate broker for twenty-three years and manages four properties in New York's Nassau and Suffolk Counties. Trial Tr. 17:18, 21–22, 18:3–7, 19:23–25. Utilizing the income capitalization approach, Mr. Greenspan's appraisal

determined the value of 60 Front Street to be $4.75 million (present) and $5,159,600 (projected)[1] and the cap rate to be 6.5% (present) and 6% (projected). Dr.'s Ex. No. 1, Ex. D, Aug. 26, 2013;[2] Trial Tr. 37:4–13, 39:20–23, 41:4–7, 55:24, 57:2. In estimating these cap rates, Mr. Greenspan relied upon (1) his experience in valuations over the years and (2) his history of representing investors and sellers in the Suffolk and Nassau Counties. Trial Tr. 40:15–20, 41:21–25. Specifically, Mr. Greenspan relied on the customer data accumulated by his company rather than any formal investor survey; he did not compare his cap rates, expenses, and rents with those of similar properties. Trial Tr. 53:12–16, 54:3–13, 55:6–9, 24. Mr. Greenspan testified that he chose a vacancy rate of 12%, equivalent to approximately five empty apartments, based upon (1) his knowledge of the area and (2) the historical vacancy rate of the premises. Trial Tr. 35:15–18, 42: 2–6, 16–19, 43:8–16, 44:24–25. Mr. Greenspan insisted that this vacancy rate would remain steady for nine-to-twelve months and would "probably" not decrease for twenty-four months. Trial Tr. 42:18–19, 43:2–5.

People's Bank's expert, CBRE, Inc. ("CBRE"), is a commercial real estate services provider. CBRE appraised 60 Front Street pursuant to the Uniform Standards of Professional Appraisal Practice ("USPAP"). Mr. Kevin Broderick ("Mr. Broderick"), First Vice President in CBRE's New York Valuation & Advisory group, performed the inspection and wrote CBRE's appraisal. Trial Tr. 61:14, 19, 21–22. According to Mr. Broderick, the value of 60 Front Street is $7 million at a cap rate of 5.5%, $6.6 million at a rate of 5.75%, and $6.3 million at a cap rate of 6%. People's Bank's Ex. No. 4 at 70, Aug. 26, 2013. Mr. Broderick utilized the sales comparison and the income capitalization approaches, the former so as to confirm the latter. People's Bank Ex. No. 5 at 72; Trial Tr. 81:17–23. To calculate the potential cap rate, Mr.

---

[1] In his testimony, Mr. Greenspan used a slightly lower figure: $5,149,000. Trial Tr. 41:7.
[2] The numbers used to identify the Parties' exhibits in this decision are the numbers assigned to each exhibit in the Court's official transcript of the August 26, 2013, hearing. Trial Tr. at 105.

Broderick considered (1) comparable sales, relying upon the same properties simultaneously used in his separate sales comparison analysis of 60 Front Street; (2) published investor surveys issued by CBRE, Realtyrates.com, Real Estate Research Corporation, and PricewaterhouseCoopers; and (3) interviews with market participants. Trial Tr. 78:14–79:5, 89:19–21. Mr. Broderick settled upon a vacancy rate of 3%, equivalent to approximately one unit, based on (1) data from REIS, Inc., a company that provides updated trends and forecasts of rent, vacancy, and inventory for scores of properties on Long Island; (2) comparison of rent with three similar complexes; (3) a "tight" market for rental properties, particularly newer constructions like 60 Front Street; and (4) his visit to the Subject Property, during which he was told by Mr. Chait that, aside for the damaged units, each apartment was occupied. Trial Tr. 74:19–75:10, 75:13–19. These sources indicated a vacancy rate range of 0% to 3.5% for rental properties on Long Island similar but not identical to 60 Front Street. Trial Tr. 74:24–75:10, 82:11–15.

Messrs. Greenspan and Broderick agreed on three points: (1) at least five units were vacant at the time of their inspections; (2) Tropical Storm Sandy had rendered at least some of these vacant units unrentable at that time; and (3) 60 Front Street's participation in Nassau County's Housing Payment In Lieu Of Taxes (PILOT) Program would likely be discontinued upon its transfer to a new owner. Trial Tr. 35:12–15, 37:16–25, 72:15–20, 45:5–10, 69:12–16, 75:13–19, 76:20–23.

## DISCUSSION

Section 506(a) of the Code[3] provides that "an allowed claim of a creditor secured by a

---

[3] The specific provisions of the Bankruptcy Code, set forth in 11 U.S.C. §§ 101–1532 inclusive, are referred to in this decision as "Section _" or "§ _" unless otherwise noted.

lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property." 11 U.S.C. § 506(a)(1). As the Supreme Court has noted, "[t]he phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral'." *United Savings Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988) (quoting H.R. Rep. No. 95-595, at 181 (1977)). Intended to effectuate § 506(a)(1), on motion of any party in interest and after a hearing on notice to the holder of the secured claim and any other entity as the court may direct, Rule 3012 of the Federal Rules of Bankruptcy Procedure allows a court to determine the value of the underlying collateral. Fed. R. Bankr. P. 3012;[4] *Orkwis v. MERS (In re Orkwis)*, 457 B.R. 243, 245 (Bankr. E.D.N.Y. 2011) (explaining the interplay between Rule 3012 and § 506(a)(1)).

As the Court has previously observed, valuation is not an exact science. *Lepage v. Bank of Am. (In re Lepage)*, Case No. 8-10-74093-reg, 2011 Bankr. LEXIS 1842, at *10–11 (Bankr. E.D.N.Y. 2011). The Court may look to the accuracy, credibility, and methodology employed by the appraisers. *Id.* at *11. When two appraisal reports conflict, a court should carefully compare "the logic of their analyses" and "the persuasiveness of their subjective reasoning." *In re Park Ave. Partners Ltd. P'ship*, 95 B.R. 605, 610 (Bankr. E.D. Wisc. 1988). A court is not bound by valuation opinions or appraisals and may form its own opinion as to a property's value. *210 Ludlow St. Corp. v. Wells Fargo Bank, N.A. (In re 210 Ludlow St. Corp.)*, 455 B.R. 443, 447 (Bankr. W.D. Pa. 2011). In the exercise of this wide latitude, a court must consider the purpose of the valuation at issue and all the facts of a particular case. *In re Lepage*, 2011 Bankr. LEXIS 1842, at *11 (collecting cases).

The three most widely recognized valuation approaches using fair market principles are

---

[4] The specific rules of the Federal Rules of Bankruptcy Procedure are referred to in this decision as "Rule _" unless otherwise noted.

(1) the market or sales comparison approach, based on evidence of comparable sales; (2) the cost or land development approach, based on actual costs of construction; and (3) the capitalization of income approach, which capitalizes the net future income that the property is capable of producing. *United States v. Certain Prop. in Manhattan*, 403 F.2d 800, 802 (2d Cir. 1968); *see also, e.g.*, *In re Heritage Highgate, Inc.*, 679 F.3d 132, 137 n.2 (3d Cir. 2012). The last method is preferred when evaluating income-producing properties and is most often used in evaluating rental and commercial properties. *Saratoga Water Servs. v. Saratoga Cnty. Water Auth.*, 83 N.Y.2d 205, 210 (N.Y. 1994); *G.R.F., Inc. v. Bd. of Assessors of Cnty. of Nassau*, 362 N.E.2d 597, 598 (N.Y. 1977). With this approach, "[t]he present value of a subject property's projected income stream and resale value are capitalized into a current, lump sum value." *Lynch v. State*, Case No. 08-S-450-NE, 2011 U.S. Dist. LEXIS 155012, at *274 (N.D. Ala. Nov. 7, 2011). This approach effectively involves the consideration of four factors: (1) gross income; (2) net operating income ("NOI"); (3) the capitalization rate; and (4) for leased property, the present value of the lessor's interest in the property which returns at the termination of the lease. 4 J. Martin Burke et al., *Modern Estate Planning (Second Edition)* § 56.12[1] (Matthew Bender & Co., Inc. 2013*); see also, e.g.*, *Whitehouse Hotel L.P. v. Comm'r*, 615 F.3d 321, 334 (5th Cir. 2010); *Seaford Assocs. v. Bd. of Assessment Review for Sussex Ctny.*, 539 A.2d 1045, 1049 (Del. 1988).

### *Lack of Independent Verification of Debtor's Data by Both Experts*

The Court first notes that neither Mr. Greenspan nor Mr. Broderick undertook an extensive and independent verification of the expenses and vacancy rates for 60 Front Street provided by Mr. Chait. Since exact expenses and vacancy rates are critical components of NOI

and, consequently, any credible income capitalization analysis, this oversight affects both Mr. Greenspan's valuation and Mr. Broderick's appraisal.[5] *See, e.g.*, *In re Ridge Mt., LLC*, Case No. 12-31090, 2012 Bankr. LEXIS 5882, at *21–22 (Bankr. N.D.N.Y. Dec. 21, 2012); *Johnson-Hines v. RES-GA EIGHT, LLC (In re Johnson-Hines)*, Case No. 11-84228-MGD, 2012 Bankr. LEXIS 2209, at *8–9 (Bankr. N.D. Ga. Apr. 3, 2012).

Mr. Greenspan's report includes a rent roll from April 2013; this single rent roll reflected the rent and vacancies as stated by Mr. Chait during Mr. Greenspan's inspection. Dr.'s Trial Ex. No. 1, Ex. B; Trial Tr. 31:3–4. Mr. Greenspan did itemize 60 Front Street's expenses in Exhibit C of his valuation, but as with the rent roll, he obtained these expenses from Mr. Chait directly and did not independently confirm their veracity. Dr.'s Trial Ex. No. 1, Ex. C; Trial Tr. 33:1–2, 34:24–35:3, 35:19–24, 41:17–20. His vacancy rate of 12% also entirely relies on Mr. Chait's representations: during his visit to the property, Mr. Greenspan neither entered a single unit nor asked for permission to do so. Trial Tr. 35:4–11, 49:13–20. After claiming personal knowledge of only one factor—the vacancy rate—during his testimony, Mr. Greenspan ultimately conceded that he had no personal knowledge of 60 Front Street's NOI *and* vacancy rate. Trial Tr. 49:6–10, 50:1–7.

Mr. Broderick also relied on third parties for key financial information about these essential factors. He utilized a rent roll and an improvement analysis provided by People's Bank and based his cap rate of 5.75% on comparable sales, investor surveys, and interviews with market participants regarding properties similar to, but not, 60 Front Street. Trial Tr. 89:5–8, 19–21. He sought more data from People's Bank, including three years of income and expense statements, copies of real estate tax bills, building area calculations and surveys, and copies of

---

[5] The Court emphasizes that Mr. Broderick's reliance on comparable figures was almost entirely due to the Debtor's failure to surrender complete and updated information about 60 Front Street prior to April 22, 2013.

any engineering reports, but he received only the rent roll and improvement analysis and the name and number of Mr. Chait, who turned over the same data he had given his own expert. Trial Tr. 88:15–23. Mr. Broderick did inspect the Subject Property, but as with Mr. Greenspan, Mr. Chait refused to show him any occupied apartment, forcing Mr. Broderick to depend upon what he was "told" by Mr. Chait regarding the financial and physical conditions of 60 Front Street. Trial Tr. 75:14–19. As an inevitable result, Mr. Broderick greatly relied on comparable apartment complexes in his appraisal and only partially on numbers specific to 60 Front Street. Trial Tr. 98:6–7.

### *Comparison of Qualifications*

The Court nonetheless finds Mr. Broderick to be the more credible of the two experts.

Despite Mr. Greenspan's success as a broker, Mr. Greenspan's qualifications as an appraiser are, at best, weak. While he has prepared fifty informal real estate valuations for perspective investors as a broker, Mr. Greenspan has never prepared a formal appraisal. Trial Tr. 18:12–13. He has twice qualified as a trial expert—but he has never been qualified as an expert appraiser. Trial Tr. 23:15–21, 24:17–19, 25:3–6. Mr. Greenspan does hold a Bachelor of Sciences in biology, but he does not hold a Member of the Appraisal Institute ("MAI") designation and does not hold himself out to be a real estate appraiser. Trial Tr. 18:17, 24:4–6, 9–16, 20–21. In his testimony, Mr. Greenspan revealed that he could not recognize key appraisal terms, including the acronym for the Uniform Standards of Professional Appraisal Practice ("USPAP"), the nation's preeminent appraisal organization, or the term "discounted cash flow" ("DCF"), and he derived his cap rate, a crucial element in any income capitalization analysis, based on his "feel of what's in the marketplace" on Long Island and the "transactions on the

market … ['we've seen']." Trial Tr. 46:21–23, 58:12–17, 39:16–17.

Conversely, People's Bank's expert, Mr. Broderick, has compiled a lengthy record as an appraiser, having worked in this capacity at American Realty Consultants, BCS Valuations, and CBRE for more than ten years. Trial Tr. 62:1–5. He is certified as a general appraiser by New York State and has a MAI designation and has spoken publicly in his capacity as an appraiser on multiple occasions. Trial Tr. 62: 7–9, 12–13, 20–22. He has performed about 1,500 appraisals in his career and specializes in commercial properties in Nassau and Suffolk Counties. Trial Tr. 63:11–15, 20–22. In 2013, he appraised approximately 75 properties and 20 apartment buildings and appeared well versed in the use of reputable sources for property data, including PricewaterhouseCoopers and REIS, Inc. Trial Tr. 63:16–20, 78:14–79:5, 89:19–21. Whereas Mr. Greenspan could not "specifically" recognize the concept, Mr. Broderick convincingly articulated why a DCF analysis would be inappropriate for 60 Front Street. Trial Tr. 81:9–12. In his appraisal, Mr. Broderick thus brought to bear the demonstrable skills of an experienced appraiser.

### *Comparison of Appraisals*

The Court also finds that Mr. Greenspan's appraisal is simply too sparse in its analysis and evidence to support a value of $4.75 million. Mr. Greenspan's entire case file totaled ten pages, and the appraisal itself was only five. Trial Tr. 25:7–9. Of these five, four contain no analysis or documentary support; rather, they summarize more information that Mr. Greenspan had obtained from Mr. Chait, including the April 2013 rent roll and the income and expenses of 60 Front Street. Trial Tr. 33:1–2, 34:24–35:3, 35:19–24, 41:17–20, 47:16–18; Dr.'s Ex. No. 1, Exs. A, B & C. Even the two-page rent roll is flawed: while it represents data for one month

(April 2013) in which the allegedly vacant units numbered five and formed the basis of Mr. Greenspan's projected long-term vacancy rate of 12%, Mr. Greenspan testified that his own work file apparently included a second rent roll for July 2013 that showed only a single vacancy. Trial Tr. 50:15–22, 76:16–19.  Mr. Greenspan's April 2013 rent roll also fails to distinguish between unrentable and rentable vacant units.  Dr.'s Ex. No. 1, Ex. B; Trial Tr. 50:1–7.

      More significantly, Mr. Greenspan's income capitalization analysis, including his cap rates and values, is entirely unsupported by any attached empirical data.  Dr.'s Ex. No. 1, Ex. D. To establish his vacancy and cap rates, Mr. Greenspan drew upon his limited experience in property valuation, his history of representing investors, and his knowledge of the area.  Trial Tr. 41:21–25.  Mr. Greenspan did not employ "any kinds of surveys" to which he could point and which he included with his appraisal; he did not apply real estate appraisal standards, instead relying on his sense of the marketplace; and he utilized the capitalization of income approach exclusively but could neither provide a concrete and accurate definition of the term "cap rate" nor explain how he settled upon 6% and 6.5% other than by "feel[ing]."  Trial Tr. 53:17–24, 54:4–13.  Indeed, his cap rate of 6.5% was based on a "generic property," and instead of surveys, he had mostly extrapolated based upon the effects of Tropical Storm Sandy and the turnover natural to a 55-plus community as he presumed them to be.  Trial Tr. 43:8–9, 11–12, 57:11–12. As a result, it is impossible to check Mr. Greenspan's valuation against "available data" and "independent" and "competent" evidence, *Seaford Assocs.*, 539 A.2d at 1049, and his analysis lacks the "objective evidential support" required for a reliable income capitalization analysis, *United States v. 47.14 Acres of Land*, 674 F.2d 722, 726 (8th Cir. 1982).  In such cases, the use of comparable data and specifically the sales comparison approach as a crosscheck is often expected, *In re La Guardia Assocs., L.P.*, Case No. 04-34512-SR, 2006 Bankr. LEXIS 4735, at

*20 (Bankr. E.D. Pa. 2006), but Mr. Greenspan did not even consider the possibility of drawing such comparisons, Trial Tr. 55:6–9. Mr. Greenspan's unwillingness both to acknowledge that a decrease in the rental rate from $2,200 to $1,500 might affect the vacancy rate and to stand by his valuation past twelve months only further strained his credibility. Trial Tr. 43:24–45:2, 45:14–46:3. Thus, Mr. Greenspan's valuation lacks the factual support and analytical rigor to conclusively validate his conclusions about the FMV of 60 Front Street.

Relative to Mr. Greenspan's report, the Court finds Mr. Broderick's appraisal to be credible in its analysis and empirical support. Like Mr. Greenspan, Mr. Broderick partly relied on Mr. Chait's representations, but as this dependence marks both experts' reports, the Court does not consider it decisive. Unlike Mr. Greenspan, however, Mr. Broderick undertook an area, neighborhood, market, site, and improvements analysis that drew upon numerous objective sources that appraisers traditionally employ. Trial Tr. 78:14–79:5, 89:19–21; People's Bank Trial Ex. No. 5 at 7–38. His methodology was consistent with industry standards, and his estimates of the vacancy and cap rates were based on empirical data specific to 60 Front Street, if possible, and on comparable sales, investor surveys, and interviews regarding similar properties, if not. People's Bank Trial Ex. No. 5 at 47–7; Trial Tr. 89:19–21, 94:21–95:2, 96:18–97:2. In particular, he sought out multi-family properties in newer or in good condition, at least two of which were 55-plus communities. Trial Tr. 90:6–10. As for the vacancy rate, Mr. Broderick not only selected the rate typical of similar Long Island properties (between 0% and 3%) but also chose one that more accurately reflected the pre-Tropical Storm Sandy rate of 60 Front Street— 2.4% (41 out of 42 units)—than the Debtor's high rate (12%). Trial Tr. 74:24–75:10, 68:8–11. In addition, he utilized a sales comparison approach so as to confirm the results of his capitalization of income analysis, People's Bank's Ex. No. 4 at 47, as qualified appraisers

frequently do when not all information relevant to the income capitalization approach can be definitively found, *see, e.g.*, *In re La Guardia Assocs., L.P.*, 2006 Bankr. LEXIS 4735, at *20; *Textron Fin.-N.J. Inc. v. Herring Land Grp.*, Civil Act. No. 06-2585 (MLC), 2011 U.S. Dist. LEXIS 70132, at *45 (D. N.J. June 29, 2011). Mr. Broderick plausibly explained why, for his sales analysis, he relied on sales comparisons with properties more than ten miles from 60 Front Street but within the same overall market. Trial Tr. 93:11–15, 97:20–23. The Court finds this use of comparable cap rates, especially in light of Mr. Broderick's incorporation of other sources into his appraisal and the widespread utilization of sales comparisons in similar cases, to be reasonable. *See In re Apple Tree Partners, L.P.*, 131 B.R. 380, 402 (Bankr. N.D. Tenn. 1991) ("The three approaches are co-dependent as well as co-indicative.").

Finally, Mr. Broderick's portrayal of the rental conditions on Long Island was buttressed by more factual evidence than Mr. Greenspan's sense of that same market. Mr. Broderick derived his estimates from third-party surveys and after personal interviews with sundry brokers and appraisers; the Debtor's counsel could point to no equally objective outside sources for Mr. Greenspan's vacancy rate of 12% in a market that Mr. Greenspan himself had described as "relatively strong right now for property owners" in his August deposition. Trial Tr. 74:19–75:10, 75:13–19, 51:17–22. While Mr. Broderick had relied on third-party surveys for his cap rate, Mr. Greenspan also testified that *his* rate was for a "generic property" and reflected "just a[n] idea of what … this type of property would be valued on in the market." Trial Tr. 57:6–12. Unlike Mr. Broderick's appraisal, however, no other corroborative evidence was offered to justify Mr. Greenspan's estimates.

For these reasons, the Court finds Mr. Broderick's appraisal, the product of a more objective and considered methodology than the Debtor's valuation, to be more credible.

**CONCLUSION**

Based on the aforementioned reasons, pursuant to Rule 3012 and § 506(a)(1), the Court finds the FMV of 60 Front Street to be $6.3 million, assuming a vacancy rate of 3% and a cap rate of 6%. An order consistent with this Decision shall be entered forthwith.

Dated:  Central Islip, New York
        September 10, 2013          */s/ Robert E. Grossman*
                                    The Honorable Robert E. Grossman
                                    United States Bankruptcy Judge